IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONSOLIDATION COAL COMPANY, ET AL.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

No. 01-254C
Judge Futey

WELLMORE ENERGY COMPANY, LLC

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 01-442C
Judge Futey

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**POST-REMAND MOTION FOR SUMMARY JUDGMENT**

John Y. Merrell, Jr.
*Attorney of Record*
John Y. Merrell
*Of Counsel*
MERRELL & MERRELL, P.C.
1477 Chain Bridge Road
Suite 101
P.O. Box 1111
McLean, VA 22101
Tel.: (703) 790-8440
Fax: (703) 790-8944

Counsel for Plaintiff
Wellmore Energy Company, LLC,

Steven H. Becker
*Attorney of Record*
Paul A. Horowitz
Charles H. Critchlow
Suzanne I. Offerman
*Of Counsel*
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel.: (212) 626-4100
Fax: (212) 310-1600

Counsel for Plaintiffs
Consolidation Coal Company, et al.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

RELEVANT PROCEDURAL HISTORY ........ 1

QUESTION TO BE RESOLVED ON REMAND.. ........ 2

SUMMARY OF ARGUMENT.. ........ 5

ARGUMENT ........ 6

I. OSM's Regulations Impose the Reclamation Fee on the Extraction and Sale of Coal ........ 6

A. The Regulatory Framework ........ 6

B. *Drummond* Confirms that OSM's Regulations Interpret "Coal Produced" to Mean the Extraction and Sale of Coal ........ 8

C. The Reclamation Fee Regulation is Fundamentally Unchanged from the Time *Drummond* was Decided ........ 11

D. OSM's 2004 Rulemaking Proceedings Confirm that, Long After *Drummond*, OSM Continued to Treat the Sale of Coal, Rather than its Extraction, as the Determining Factor in Ascertaining when Coal is "Produced" ........ 12

II. The Reclamation Fee Regulations, as Applied to Export Sales of Coal, Violate the Export Clause ........ 14

CONCLUSION ........ 16

APPENDIX

PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT...... 1a

GOVERNMENT'S RESPONSE TO PLAINTIFFS'S PROPOSED FINDINGS OF UNCONTROVERTED FACT ........ 10a

CERTIFICATE OF ELECTRONIC FILING

# TABLE OF AUTHORITIES

**Page**

## COURT CASES

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................ 15

*Consolidation Coal Co. v. United States*, 351 F.3d 1374 (Fed. Cir. 2003) ........................................................ 4

*Consolidation Coal Co. v. United States*, 64 Fed. Cl. 718 (2005) ........................................ 1, 2, 3

*Consolidation Coal Co. v. United States*, 528 F.3d 1344 (Fed. Cir. 2008) ........................ *passim*

*Drummond Coal Co. v. Hodel*, 610 F. Supp. 1489 (D.D.C. 1985) ................................. 6, 8 ,9

*Drummond Coal Co. v. Hodel*, 796 F.2d 503 (D.C. Cir. 1986) ........................... 3, 6, 8, 9, 15

*Exxon Chemical Patents, Inc. v. Ubrizol Corp.*, 137 F.3d 1475 (Fed. Cir. 1998) ........................................................ 4, 5

*Nufarm America's, Inc. v. United States*, 521 F.3d 1366 (Fed. Cir. 2008), *petition for cert. filed*, 8 S. Ct. Today (BNA) 144 (U.S. July 3, 2008) ........................................................ 4, 10

*Ranger Fuel Corp. v. United States*, 33 F. Supp. 2d 466 (E.D. Va. 1998) ........................................................ 12

## UNITED STATES CONSTITUTION

Export Clause
U.S. Const. art. I, § 9, cl. 5 ........................................................ *passim*

## STATUTES

26 U.S.C. § 4121 ........................................................ 12

30 U.S.C. § 1232(a) ........................................................ 1, 2, 12

## REGULATIONS

30 C.F.R. § 837.12(a)(1977) ........................................................ 7

30 C.F.R. § 837.12(b)(1977) ........................................................ 7

30 C.F.R. § 870.12 ........................................................ 1, 7

30 C.F.R. § 870.12(a) ........................................................ 3, 10

30 C.F.R. § 870.12(b) ........................................................ 3, 5, 7

30 C.F.R. § 870.12(b)(1) ........................................................ 5

30 C.F.R. § 870.12(b)(3)(i) ........ *passim*
30 C.F.R. § 870.13(a) ........ 13
30 C.F.R. § 870.13(b) ........ 13, 14
30 C.F.R. § 870.18 ........ 11
42 Fed. Reg. 62,639 (Dec. 13, 1977) ........ 7
43 Fed. Reg. 49,940 (Oct. 25, 1978) ........ 7
47 Fed. Reg. 28,574 (June 30, 1982) ........ 7, 8
52 Fed. Reg. 18,680 (May 18, 1987) ........ 11, 12
53 Fed. Reg. 19,718 (May 27, 1988) ........ 7, 11
69 Fed. Reg. 56,122 (Sept. 17, 2004) ........ 12, 13
73 Fed. Reg. 35,214 (June 20, 2008) ........ 14

## COURT RULES

Rules of the U.S. Court of Federal Claims
Rule 54(b) ........ 1

## MISCELLANEOUS

Transcript of Oral Argument, *Consolidation Coal Co. v. United States*, No. 01-254C and *Rapoca Energy Co. v. United States*, No. 01-442C (Feb. 14, 2005) ........ 8

## INTRODUCTION

Plaintiffs, Consolidation Coal Company, *et al.* and Wellmore Energy Company, LLC, producers and exporters of coal, hereby file their combined brief in support of their post-remand motion for summary judgment. Plaintiffs are entitled to summary judgment because there is no genuine issue of material fact[1] and Plaintiffs are entitled to judgment as a matter of law. The reclamation fee regulation promulgated by the Department of Interior's Office of Surface Mining Reclamation and Enforcement ("OSM"), 30 C.F.R. § 870.12, under which OSM imposed the fees at issue, is unconstitutional, under the Export Clause of the Constitution, as applied to sales of coal for export from the United States.

## RELEVANT PROCEDURAL HISTORY

On April 4, 2005, this Court granted Plaintiffs' motion for summary judgment, and held that the reclamation fee payable on "coal produced" under 30 U.S.C. § 1232(a) is imposed upon the sale of coal and therefore is unconstitutional, under the Export Clause of the Constitution, as applied to sales of coal for export from the United States. *See Consolidation Coal Co. v. United States*, 64 Fed. Cl. 718 (2005). On February 22, 2007, this Court entered a money judgment under RCFC 54(b) for one of the plaintiffs, Jim Walter Resources, Inc., which the government appealed to the Court of Appeals for the Federal Circuit. On June 11, 2008, the Federal Circuit reversed this Court's grant of summary judgment in favor of the coal producers, holding, as a matter of *statutory* interpretation, that based on the doctrine of "constitutional avoidance," the reclamation fee *statute* must be interpreted as imposing the tax on the extraction of coal because

---

[1] For purposes of this motion, Plaintiffs rely on Plaintiffs' Proposed Findings of Uncontroverted Fact filed on May 21, 2004 in connection with Plaintiffs' Motion for Summary Judgment filed on that same date, and on the government's response to those Proposed Findings of Uncontroverted Fact, filed on July 9, 2004. *See* Docket Entry Nos. 44 and 47, Court No. 01-254C, which are reproduced in the Appendix to this brief.

that is a reasonable interpretation which preserves the *statute's* constitutionality. *Consolidation Coal Co. v. United States*, 528 F.3d 1344 (Fed. Cir. 2008). The Federal Circuit's opinion, which contains no discussion of the government's regulatory implementation of the statute, let alone the constitutionality thereof, did not direct that Plaintiffs' action be dismissed, but instead remanded the case "for proceedings consistent with [its] opinion." *Id.* at 1348. Following a status conference on June 25, 2008, this Court ordered that Plaintiffs may file a renewed Motion for Summary Judgment, challenging the government's regulatory implementation of the statute, within 30 days after the issuance of the mandate by the Federal Circuit. *See* Order filed June 30, 2008. The Federal Circuit issued its mandate on August 4, 2008.

**QUESTION TO BE RESOLVED ON REMAND**

The Federal Circuit acknowledged that if "'coal produced' is interpreted to include the entire process of extracting and selling coal—if it is a tax on extraction *and* sale—then, as it applies to sales that occur in the export process, it is an unconstitutional violation of the Export Clause." *Consolidation Coal*, 528 F.3d at 1347. The court also noted that "[b]oth sides agree the reclamation fee would be constitutional if imposed solely on coal extracted." *Id.* In choosing between these two alternatives, the Federal Circuit addressed only whether the reclamation fee *statute*, 30 U.S.C. § 1232(a), must be interpreted as imposing the tax on coal extracted. The Federal Circuit expressed no opinion on, and thus left open for resolution by this Court on remand, the question of whether OSM's *administration* of the statute, through its regulations, imposes the reclamation fee on coal extracted *and sold*, and thus violates the Export Clause when applied to export sales of coal.

This Court's decision had addressed the meaning of "'coal produced' as described in 30 U.S.C. § 1232(a)." *Consolidation Coal*, 64 Fed. Cl. at 725. It concluded that the statutory

term encompasses the extraction and sale of coal by virtue of OSM's reasonable interpretation of that term, which was upheld in *Drummond Coal Co. v. Hodel*, 796 F.2d 503 (D.C. Cir. 1986). *See Consolidation Coal*, 64 Fed. Cl. at 726-27. On appeal, the Federal Circuit therefore stated that the "only question before this court is one of *statutory* interpretation of *30 U.S.C. § 1232(a)*." 528 F.3d at 1347 (emphasis added); *see also id.* at 1348 ("the sole question is whether, in determining if the *statute* violates the constitutional prohibition of export taxes, 'coal produced' properly is defined as 'coal extracted'") (emphasis added).

The Federal Circuit held that the interpretation sustained in *Drummond* does not govern the statutory analysis in this case because "[i]n *Drummond* . . . the D.C. Circuit was not interpreting the statute in light of the potential conflict with the Export Clause." *Consolidation Coal*, 528 F.3d at 1347. Instead, the Federal Circuit invoked the doctrine of constitutional avoidance and held that "the government's construction must . . . prevail as it is the only reasonable construction which preserves the constitutionality of the *statute*." *Id.* (emphasis added).

In its opinion, the Federal Circuit expressed no view as to whether the government's regulatory implementation of the statute, as opposed to the statute itself, was unconstitutional. Although the Federal Circuit cited certain portions of OSM's regulations, 30 C.F.R. §§ 870.12(a) and (b), it did so only to point out that, like the statute, the regulations do not specifically define the term "coal produced." 528 F.3d at 1347. The Federal Circuit did not address whether these subsections, in conjunction with another subsection to which the court did not cite, 30 C.F.R. § 870.12(b)(3)(i), implement the tax in a manner contrary to the saving construction of the statute, i.e., whether they impose the tax on the extraction *and sale* of coal, rather than solely on the extraction of coal.

Plaintiffs contend that these regulations do, in fact, impose the reclamation fee on the extraction and sale of coal, and thus violate the Export Clause when applied to export sales of coal. Whether the regulations violate the Export Clause is a question distinct from whether the statute violates the Export Clause. The Federal Circuit itself recognized this earlier in this litigation, when it upheld this Court's jurisdiction over Plaintiffs' lawsuit under the Tucker Act. *See Consolidation Coal Co. v. United States*, 351 F.3d 1374, 1378 n.4 (Fed. Cir. 2003) ("[B]ecause we conclude that the Court of Federal Claims possesses jurisdiction over the regulatory challenge of their complaints, we find it unnecessary to resolve the question of whether the coal producers are also challenging the statutory imposition of the reclamation fee."); *see also Nufarm America's, Inc. v. United States*, 521 F.3d 1366 (Fed. Cir. 2008) (court reviewed the constitutionality of an implementing regulation, but not the statute, which was unchallenged in the lower court, under the Export Clause), *petition for cert. filed*, 8 S. Ct. Today (BNA) 144 (U.S. July 3, 2008) (No. 08-31).

"[A] district court is free to take any action that is consistent with the appellate mandate, as informed by both the formal judgment issued by the court and the court's written opinion." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1484 (Fed. Cir. 1998). Stated slightly differently, this Court may conduct proceedings at its discretion "as long as the new [proceedings] would not be inconsistent with the mandate of the earlier opinion as gleaned from the judgment together with the accompanying opinion." *Id.* In this regard, "an appellate mandate governs only that which was actually decided." *Id.* at 1478.

Applying these standards, the Federal Circuit has recognized that even where "[t]he operative language of the judgment consisted of the single word "reversed," *id.* at 1483, a district court was "free to consider" a patent plaintiff's motion for a new trial because the court of

appeals' opinion referred only to the plaintiff's claim of literal infringement, and did not deal with the issue of infringement under the doctrine of equivalents. *Id.* at 1478.

Here, by the Federal Circuit's express language, the "sole question" addressed by the court was "whether . . . the *statute* violates the constitutional prohibition of export taxes." *Consolidation Coal,* 528 F.3d at 1348 (emphasis added). As the Federal Circuit's opinion was therefore limited to the issue of the constitutionality of the statute, and because it affirmatively remanded the case "for proceedings consistent with [its] opinion," *id.*, there is unfinished business for this Court to attend to on remand, namely, a determination of whether OSM's *administration* of the statute, through its regulations, violates the Export Clause. It is therefore incumbent upon this Court to resolve the unaddressed question regarding the constitutionality of OSM's regulations under the Export Clause. For the reasons set forth herein, we respectfully submit that a review of those regulations, as implemented, admits of but one conclusion: that OSM's regulatory implementation of the reclamation fee is unconstitutional as applied to sales of coal in the export stream.

## SUMMARY OF ARGUMENT

The Federal Circuit held, under the doctrine of constitutional avoidance, that the reclamation fee statute must be interpreted as imposing the tax on the extraction of coal alone. However, through its regulations, OSM has long-administered, and continues to administer, the tax in a way that is inconsistent with the saving construction of the statute.

Specifically, OSM's regulations impose the tax on the extraction *and sale* of coal: (1) § Section 870.12(b) of the regulations imposes the tax on the weight of coal at the time of initial bona fide sale; (2) § 870.12(b)(1) provides that the initial bona fide sale is the first transaction after the coal's severance; and (3) § 870.12(b)(3)(i) specifically imposes the tax on

the weight of coal sold, inclusive of materials that are added after the coal is extracted from the ground.

The D.C. Circuit, in an interpretation of the regulations that was not questioned by the Federal Circuit, recognized that § 870.12(b)(3)(i) taxes the weight of material added to the coal after it is extracted precisely because OSM's regulations interpret the term "coal produced" to include the extraction *and sale* of coal. Because the Federal Circuit expressly recognized that imposition of the reclamation fee on the extraction and sale of coal would render it unconstitutional as applied to export sales, this Court should grant Plaintiffs' motion for summary judgment on the issue of liability and issue a new money judgment in Jim Walter Resources' favor, based on the violation of the Export Clause caused by OSM's regulations.

## ARGUMENT

### I. OSM's Regulations Impose the Reclamation Fee on the Extraction and Sale of Coal.

The Federal Circuit acknowledged that if the reclamation fee on "coal produced" is imposed on "the entire process of extracting and selling coal—if it is a tax on extraction *and* sale—then, as it applies to sales that occur in the export process, it is an unconstitutional violation of the Export Clause." *Consolidation Coal,* 528 F.3d at 1347. It was this exact interpretation of "coal produced" that was sustained by the D.C. Circuit in *Drummond Coal Co. v. Hodel*, 796 F.2d 503 (D.C. Cir. 1986), *aff'g*, 610 F. Supp. 1489, 1497 (D.D.C. 1985). Significantly, the *Drummond* courts recognized that OSM's implementing regulations embodied this interpretation.

#### A. The Regulatory Framework

OSM has recognized that given the statute's silence as to the meaning of "coal produced," it has fallen upon the agency to fill the gap in the statute through implementing regulations. As OSM has stated:

> Neither the [Surface Mining Control and Reclamation Act of 1977] nor the legislative history explicitly defines the term 'coal produced' or indicates the Congressional intent as to how the term should be implemented. See *Drummond Coal Company v. Hodel*, 796 F.2d 503 (D.C. Cir. 1986), *cert. denied*, 107 S. Ct. 1593 (1987) (hereafter *Drummond*). As Congress did not determine the point in time at which the reclamation fee should be assessed or what the weight of the coal should include, the Secretary of the Interior (Secretary) has wide discretion to consider a number of alternatives for determining fee liability.

53 Fed. Reg. 19,718 (May 27, 1988).

Since 1977, OSM's implementing regulations have provided, *inter alia*:

> (a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use, including the products of in situ mining.
>
> (b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

30 C.F.R. § 870.12.[2]

In 1982, "[i]n order to clarify the point in time of fee determination, as well as the . . . weight parameters for calculating reclamation fees," 47 Fed. Reg. 28,574, 28,577 (June 30, 1982), OSM added the following subsections to § 870.12(b):

> (1) The initial bona fide sale, transfer of ownership, or use shall be determined by the first transaction or use of the coal by the operator immediately after it is severed, or removed from a reclaimed coal refuse deposit.
>
> * * *
>
> (3) The weight of each ton shall be determined by the actual gross weight of the coal.
>
> (i) Impurities, including water, that *have not* been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator *shall not* be deducted from the gross weight.

OSM noted that the 1982 amendment "restates OSM policy in effect since initial implementation of the fee collection program in December, 1977," and that both the prior rule and the 1982

---

[2] This regulation originally appeared as § 837.12(a) and (b) of Title 30, Code of Federal Regulations. *See* 42 Fed. Reg. 62,639, 62,715 (Dec. 13, 1977). OSM subsequently renumbered its regulations and this regulation now appears in Part 870. *See* 43 Fed. Reg. 49,940 (Oct. 25, 1978).

amendment "require that fees be paid on the actual weight of the coal *sold*." 47 Fed. Reg. at 28,577-78 (emphasis added).

As discussed below, in the *Drummond* litigation, the D.C. District Court and the D.C. Circuit analyzed OSM's regulations, including § 870.12(b)(3)(i), and confirmed that OSM's regulations interpret and apply the term "coal produced" as including not merely the extraction of coal, but rather the extraction and sale of coal.

### B. *Drummond* Confirms that OSM's Regulations Interpret "Coal Produced" to Mean the Extraction and Sale of Coal.

In *Drummond* a coal operator challenged the validity of the 1982 amendment to OSM's regulation, § 870.12(b)(3)(i), on the ground that it "exceed[ed] the Secretary's statutory authority because it include[d] within the material taxed 'excess' moisture attributable to post-excavation rainfall or washing, which Drummond assert[ed] is not properly regarded as part of 'coal.'"[3] 796 F.2d at 504.

To determine whether OSM's regulation was *ultra vires*, the *Drummond* courts were required to interpret the phrase "coal produced," upon which the reclamation fee is imposed. The district court observed:

> 30 U.S.C. § 1232 states that a reclamation fee of 35 cents per ton of "coal *produced* by surface coal mining" shall be levied on all coal operators. Emphasis added. The term "produced" is ambiguous. "Production" could reasonably be interpreted to include the entire process of extracting and selling coal, complete

---

[3] Coal in its unmined state contains some inherent moisture. "Excess moisture" is non-inherent moisture "which accumulates after coal is extracted from the ground as a result of immersion in water during the washing process or exposure to rainfall." *Drummond*, 796 F.2d at 504 n.2. The court noted that although Drummond "ignored the non-inherent *debris* mixed with the coal," and limited its challenge to OSM's taxation of excess moisture, "the logic of their position would apply to all impurities" not inherent to coal. *Id.* at 507 n.10. In addition to the post-extraction debris mentioned in *Drummond*, other material added after extraction can include, for example, oil treatment and antifreeze. *See* Transcript of Oral Argument at 76, *Consolidation Coal Co. v. United States*, No. 01-254C and *Rapoca Energy Co. v. United States*, No. 01-442C (Feb. 14, 2005).

> from pit to buyer's door, or it could refer solely to the process of extraction. The latter interpretation would support the conclusion that impurities added after extraction, such as moisture, should not be taxed. The former interpretation would imply that the gross product sold to the buyer—even if it contains impurities and moisture—should serve as the basis for taxation.

*Drummond*, 610 F. Supp. at 1497 (emphasis in original). The district court upheld OSM's regulation imposing the reclamation fee on excess moisture because the "regulations adopt the first of the two possible interpretations of section 1232," *id.* at 1498, i.e., that "coal produced" includes "the entire process of extracting and selling coal." *Id.* at 1497.

The D.C. Circuit affirmed, stating: "Like the district court, we do not find the ordinary meaning of [coal produced] unambiguous: "'Production' could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction.'" 796 F.2d at 505 (quoting 610 F. Supp. at 1497). Upholding OSM's adoption of the first of these two possible interpretations in its regulations, the D.C. Circuit concluded by stating:

> We do not say that the Secretary is or was forbidden to adopt Drummond's suggested definition of "coal produced." Rather, we hold that because Congress had no specific intention on this point, the Secretary, under *Chevron*, had the authority to fashion a reasonable interpretation. This the Secretary has done.

796 F.2d at 508.

The *Drummond* decisions thus confirm, notwithstanding the Federal Circuit's recent interpretation of the *statutory* language "coal produced" as meaning the extraction of coal, that OSM, through its *regulations*, has in fact long-imposed the reclamation fee on the extraction and sale of coal, rather than solely on its extraction. Based on its rulemaking authority, OSM embarked on a course of action that, for three decades, has broadly interpreted and applied the term "coal produced." The reality of that regulatory course of action is indelible, and has resulted in the taxation of export sales in violation of the Export Clause. It cannot be, and is not,

erased by the Federal Circuit's recent decision that the statutory term "coal produced" must mean something different after all.

The government has previously contended in this case that a plain reading of the regulations shows that production does not include the sale of coal, because otherwise, 30 C.F.R. § 870.12(a), which states that coal operators shall pay a reclamation fee on each ton of "coal produced for sale, transfer, or use," would contain redundant references to sale, transfer or use. But even assuming, *arguendo*, that the reference to sale was redundant (an occasional hazard of agency drafting), it does not negate the fact that, for three decades, OSM's regulations have operated in such a way as to include sale within the meaning of "coal produced." Indeed, it was only because "coal produced" extended through the sale of coal that the agency's inclusion of post-extraction moisture in the taxable weight was upheld in *Drummond*.

Nor, as the government has previously argued here, can OSM's regulations be dismissed as merely deferring the calculation or payment of the reclamation fee until the time of sale, rather than imposing it at that time. As the *Drummond* courts recognized, OSM's regulations interpret the *imposition* of the tax as falling on the sale of coal, which, in turn, justified OSM's *calculation* of the tax on the weight of coal sold, inclusive of post-extraction material (in that case, excess moisture). Thus, as *Drummond* recognized, the reclamation fee, as administered by regulation, is both imposed *and* calculated on the sale of coal. *Contrast*, *Nufarm America's, Inc. v. United States*, 521 F.3d 1366, 1368 (Fed. Cir. 2008) (holding that a regulation which, "[o]n its face, . . . expressly refers to a duty on imports, not exports," and by its terms is part of a "duty-deferral program," imposes a duty on imports and merely postpones its collection until the time of export).

### C. The Reclamation Fee Regulation is Fundamentally Unchanged from the Time *Drummond* was Decided.

Two years after *Drummond* was decided, OSM revised its regulations to allow a deduction for the weight of excess moisture even when present in coal at the time of sale. However, OSM's decision did not reflect any change in its regulatory interpretation of "coal produced." Its regulations continue to tax substances (other than excess moisture) that are added to coal after extraction and present at the time of sale (e.g., oil treatment, antifreeze, and post-extraction debris, *see supra* note 3). Indeed, OSM specifically stated that the change in its treatment of excess moisture "does not otherwise alter the general rule which requires all impurities not removed from coal to be included in its gross weight for [reclamation] fee assessment purposes." 53 Fed. Reg. 19,718, 19,719 (May 27, 1988). It merely "create[d] an exception in § 870.12(b)(3)(i)," *id.*, which was amended to its current form to provide that "[i]mpurities that have not been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator, excluding excess moisture for which a reduction has been taken pursuant to § 870.18, shall not be deducted from the gross weight." 53 Fed. Reg. at 19,726.

Notably, under the post-*Drummond* version of § 870.12(b)(3)(i), even excess moisture is taxed if present at the time of sale "unless the operator has made the reduction" pursuant to § 870.18. 52 Fed. Reg. at 18,681. OSM may continue to tax excess moisture through this default mechanism for the same reason that it taxed excess moisture through the version of the regulation considered in *Drummond*: because when it comes to imposing the tax, OSM's regulations treat "coal produced" as encompassing the sale, and not merely the extraction, of coal.

Further confirmation that OSM's revised treatment of excess moisture did not signal any deviation from its interpretation of "coal produced" as encompassing the sale is found in OSM's acknowledgment in 1987 that its sole intention was to align its treatment of excess moisture with the IRS' treatment of this material under the Black Lung Excise Tax, 26 U.S.C. § 4121:

> [A]n inconsistency in the methods of determining coal weight under various Federal taxation requirements now exists. Under Internal Revenue Service Revenue Ruling 86-96, operators can reduce their Black Lung tax liability by taking a deduction based on the weight of excess moisture content of the coal. At the same time, operators are required to include that same amount when determining their [reclamation] fee liability. Since this situation is different from the one that existed prior to 1982, where only one State's taxation method differed from the [reclamation fee] method, OSMRE has decided to reconsider the issue of including the weight of moisture absorbed after the coal's severance from the seam in the assessment of the [reclamation] fee. Accordingly, OSMRE is proposing this change to the regulations.

52 Fed. Reg. at 18,681. The Black Lung Excise Tax has nothing to do with coal extraction, but rather is imposed on coal sold and thus has been held to violate the Export Clause. *See Ranger Fuel Corp. v. United States*, 33 F. Supp. 2d 466 (E.D. Va. 1998). Just as the IRS' allowance of a deduction for excess moisture did not alter the fundamental nature of the Black Lung Excise Tax as a tax on the sale of coal, OSM's allowance of such a deduction after *Drummond* did not alter the nature of the reclamation fee as a tax that the agency imposes on the extraction and sale of coal.

### D. OSM's 2004 Rulemaking Proceedings Confirm that, Long After *Drummond*, OSM Continued to Treat the Sale of Coal, Rather than its Extraction, as the Determining Factor in Ascertaining when Coal is "Produced."

Congress originally authorized collection of the reclamation fee for 15 years following its enactment in the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §°1232(a). OSM's collection authority, as well as the reclamation fee rates set forth in the SMCRA, were subsequently extended through September 30, 2004. *See* 69 Fed. Reg. 56,122 (Sept. 17, 2004). Congress authorized OSM to thereafter establish the tax rates at levels

sufficient to provide for the transfer of certain amounts from the reclamation fee fund to the United Mine Workers of America Combined Benefit Fund, which transfers have been occurring since the mid-1990s. *Id.*

In anticipation of the expiration of the statutory tax rates, and in order to fulfill Congress' mandate for the continued transfer of monies to the Mine Workers' fund, OSM adopted a final rule on September 17, 2004, which established tax rates for "coal produced" after September 30, 2004. 69 Fed. Reg. at 56,122. This rule again reconfirmed that long after *Drummond*, OSM continued to administer the statute by defining "coal produced" as coal sold, rather than coal extracted. The date when coal is "produced," and by extension the applicable tax rate, turned on the date it is sold, not the date it is extracted.

The final rule amended 30 C.F.R. § 870.13(a), which set forth the statutory rates provided in the SMCRA, to clarify that the SMCRA rates applied only to fees for coal produced on or before September 30, 2004. The rule also added a new provision, § 870.13(b), which established the tax rates for coal produced after September 30, 2004. *See* 69 Fed. Reg. at 56,125 & 56,142. Under the rule, stockpiled coal that was mined *and sold before October 1, 2004* was subject to the statutory rates under the SMCRA, meaning that OSM considered it to be *coal produced before October 1, 2004.*[4] Stockpiled coal mined before October 1, 2004 *and sold on or after that date* was subject to the rates established in new § 870.13(b), meaning that OSM considered it to be *coal produced on or after October 1, 2004.*[5] Thus, the rule demonstrates that OSM continued to adhere to the regulatory interpretation upheld in *Drummond*, whereby "coal produced" was

[4] *See* 69 Fed. Reg. 56,122, 56,128 ("coal that was sold before October 1, 2004, but that has not physically left the minesite is subject to the fees established in section 402(a) of the [SMCRA], which will now be codified in" § 870.13(a)).

[5] *See* 69 Fed. Reg. at 56,128 ("[s]tockpiled coal that was mined before October 1, 2004, is subject to the fees established in this rule at the time it is used, sold, or transferred").

not limited to extraction, but rather extended through the sale of the coal, for it was the date of the *sale* which determined when coal was deemed to be *produced*, and hence, the applicable rate.[6]

## II. The Reclamation Fee Regulations, as Applied to Export Sales of Coal, Violate the Export Clause.

The Federal Circuit acknowledged that if "'coal produced' is interpreted to include the entire process of extracting and selling coal—if it is a tax on extraction *and* sale—then, as it applies to sales that occur in the export process, it is an unconstitutional violation of the Export Clause." *Consolidation Coal*, 528 F.3d at 1347. As demonstrated *supra*, although the Federal Circuit held, under the doctrine of constitutional avoidance, that the reclamation fee *statute* must be interpreted as imposing the tax solely on the extraction of coal, OSM's *regulations*, which implement the statute, have time and time again adopted, and still maintain, a contrary interpretation which treats "coal produced" as including both the extraction and sale of coal. Therefore, the regulations imposing the reclamation fee in this fashion are unconstitutional as applied to sales of coal in the export stream.

The Federal Circuit implicitly recognized that OSM's interpretation of "coal produced," which was addressed by the D.C. Circuit in *Drummond*, would render the reclamation fee unconstitutional as applied to export sales of coal. *See Consolidation Coal*, 528 F.3d at 1347-48. However, the Federal Circuit did not adopt this interpretation with respect to the *statute* because "the D.C. Circuit was not interpreting the statute in light of the potential conflict with the Export Clause." *Id.* at 1347. Instead, the Federal Circuit concluded that because the statute "can

---

[6] Congress subsequently extended the statutory rates through 2007 by way of a series of short interim extensions, before finally establishing new statutory rates through 2021. *See* 73 Fed. Reg. 35,214, 35,219 (June 20, 2008). Thus, OSM has recently proposed replacing § 870.13(b) of the regulations with a new paragraph (b) setting out the new rates established by Congress. *See id.*

reasonably be interpreted to mean 'coal extracted,'" *id.*, this construction must "prevail as it is the only reasonable construction which preserves the constitutionality of the statute." *Id.* at 1348.

The constitutionality of the *regulations*, however, turns on the interpretation of "coal produced" that OSM in fact adopted and actually embodied in those regulations to fill the gap created by the absence of a statutory definition of "coal produced" — a gap recognized by both the D.C. Circuit in *Drummond* and the Federal Circuit in this case. *See Drummond*, 796 F.2d at 508; *Consolidation Coal*, 528 F.3d at 1347. And, unlike the statutory analysis, there is no room for the constitutional avoidance doctrine to operate with regard to the regulations and negate the Export Clause violation resulting therefrom.

The constitutional avoidance doctrine permits only interpretations that are "plausible," *Clark* v. *Martinez*, 543 U.S. 371, 380 (2005), and it simply is not plausible to interpret the regulations as imposing the reclamation fee solely on the extraction of coal when they tax the mass of coal at the time of sale, based on the weight of coal sold, inclusive of substances that were never in the mine and extracted in the first place. Although the *Drummond* courts acknowledged that OSM *could have* reasonably interpreted "coal produced" to mean solely the extraction of coal, the fact remains that, as *Drummond* also recognized, OSM did not do so, and instead promulgated regulations which effectuate OSM's interpretation of the term as including extraction and sale.

OSM can, of course, on a prospective basis, conform its regulations to the statutory definition adopted by the Federal Circuit by revising them to impose the reclamation fee only on the extraction of coal. But because until now it has administered the statute in a way contrary to the Federal Circuit's recent interpretation, and has imposed and collected the reclamation fee on

the extraction *and sale* of coal in violation of the Export Clause, Plaintiffs are entitled to a refund of reclamation fees paid on their sales in the export stream.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment on the constitutional issue and enter a new money judgment in favor of Jim Walter Resources, Inc.

Respectfully submitted,

John Y. Merrell, Jr.
*Attorney of Record*
John Y. Merrell
*Of Counsel*
MERRELL & MERRELL, P.C.
1477 Chain Bridge Road
Suite 101
P.O. Box 1111
McLean, VA 22101
Tel.: (703) 790-8440
Fax: (703) 790-8944

Counsel for Plaintiff
Wellmore Energy Company, LLC

Dated: September 3, 2008

Steven H. Becker
*Attorney of Record*
Paul A. Horowitz
Charles H. Critchlow
Suzanne I. Offerman
*Of Counsel*
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel.: (212) 626-4100
Fax: (212) 310-1600

Counsel for Plaintiffs
Consolidation Coal Company, et al.

September 3, 2008

# Appendix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CONSOLIDATION COAL COMPANY, ET AL.,<br>Plaintiffs,<br>v.<br>UNITED STATES,<br>Defendant. | No. 01-254C<br>Judge Futey |
| RAPOCA ENERGY COMPANY, LLC,<br>F/K/A RAPOCA ENERGY COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 01-442C<br>Judge Futey |

## PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, Plaintiffs Consolidation Coal Company, et al. and Rapoca Energy Company, LLC (formerly Rapoca Energy Company), contend there exists no genuine dispute as to the following material facts upon which Plaintiffs base their motion for summary judgment. Plaintiffs' complaint ("Pls. Compl.") and the affidavits ("Affs.") set forth in the Appendix ("A__") to Plaintiffs' brief in support of their motion, and other papers submitted in this matter establish the following facts:

1. Plaintiffs are producers, sellers and exporters of coal. Pls. Compl. ¶ 2; *see also* Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 1 (A1-65).

2. Plaintiffs have paid reclamation fees pursuant to 30 U.S.C. § 1232 and 30 C.F.R. § 870. Pls. Compl. ¶ 2; *see also* Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 2 (A1-65).

3. Exports account for less than 10% of total U.S. production of coal. Department of Energy, Energy Information Administration, *Quarterly Coal Report, Oct.-Dec. 2003*, at 1, Table 1. (A13).

4. Plaintiffs do not pay reclamation fees until after the coal is sold by them. Pls. Compl. ¶¶ 9 and 11; *see also* Hartzler, Morris, Simmons and Weaver Affs. ¶ 4 (A21, 32, 51 and 61); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶¶ 4 and 6 (A1-16, 22-29, 33-48, 52-59, 63-65).

5. Plaintiffs sell coal pursuant to contracts between Plaintiffs and their foreign customers. Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶ 3(a) (A1-48, 52-59, 63-65).

6. After the coal is mined by Plaintiffs, it is moved to raw coal storage areas for temporary storage and then fed into a preparation plant (or moved to a unit train loadout facility) where the coal is processed to meet Plaintiffs' foreign customer's specifications. Simmons Aff. ¶ 3(b)

(A50); Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Smith, Taylor, Weaver and Wells Affs. ¶ 3(a) (A1-48, 52-65).

7. After the coal is processed, the coal is either loaded directly onto railcars that will transport the coal to the export terminal, or the coal is stored temporarily while awaiting arrival of the railcars. Robinson Aff. ¶ 3(a) (A42); Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(b) (A1-40, 45-65).

8. Processed coal placed in temporary storage to await the arrival of the railcars is stored for a very brief period of time and only until the next scheduled train arrives to transport the coal to the export terminal. Robinson Aff. ¶ 3(a) (A42); Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor and Wells Affs. ¶ 3(b) (A1-40, 45-59, 63-65).

9. In addition to transporting processed coal by railcar to the export terminal, certain Plaintiffs, on occasion, either load processed coal directly onto trucks that will transport the coal to the export terminal or foreign customer, or transport processed coal by their own railcars to a harbor facility where the coal is loaded onto barges that move the coal to a railcar loading facility, where the coal is placed onto railcars for delivery to the export terminal. Hartzler Aff. ¶¶ 3(b), 3(d) (A18-19); Morris Aff. ¶ 3(b) (A30-31).

10. Plaintiffs do not use (*i.e.*, produce for their own consumption) any coal loaded for shipment to the export terminal or foreign customer. Robinson Aff. ¶ 3(b) (A42); Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(c) (A1-40, 45-65).

11. Once Plaintiffs' coal is loaded onto railcars, it is bound for the export terminal and is not diverted for domestic sale. Nor is coal diverted for domestic sale after it is loaded into trucks hired by foreign customers. Robinson Aff. ¶ 3(b) (A42); Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(c) (A1-40, 45-65).

12. Plaintiffs' coal takes between one and seven days to reach the export terminal, depending upon the method of transportation and locations of the mine and export terminal. Hartzler Aff. ¶¶ 3(d)-(f) (A18-20); Robinson Aff. ¶ 3(b) (A42); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(c) (A1-16, 22-40, 45-65).

13. Plaintiffs and the railroad companies arrange the shipment of the coal from the mine (or loadout) so as to coincide with the arrival of the vessel at the export terminal. Hartzler Aff. ¶¶ 3(d)-(f) (A18-20); Robinson Aff. ¶ 3(c) (A42); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(d) (A1-16, 22-40, 45-65).

14. The railroad documents specify the pier at the export terminal to which Plaintiffs' coal is destined. Hartzler Aff. ¶¶ 3(d)-(f) (A18-20); Robinson Aff. ¶ 3(c) (A42); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(d) (A1-16, 22-40, 45-65).

15. When Plaintiffs' coal is transported to an export terminal that does not have storage facilities, the coal is moved directly from the railcars into the hold of the vessel. Hartzler Aff. ¶ 3(e) (A19); Robinson Aff. ¶ 3(c) (A42); Argon, Bethel, Bradshaw, Dickey, Leefers,

McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(d) (A1-16, 22-40, 45-65).

16. When Plaintiffs' coal is transported to an export terminal that has storage facilities, the coal is either moved directly from the railcars into the vessel's hold or is stockpiled temporarily and then transferred into the vessel's hold. Hartzler Aff. ¶¶ 3(d) and 3(f) (A18-20); Robinson Aff. ¶ 3(c) (A42-43); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(d) (A1-16, 22-40, 45-65).

17. At the export terminal, Plaintiffs' coal is moved into the hold of the vessel based on a predetermined stowage plan. Hartzler Aff. ¶¶ 3(d)-(f) (A18-20); Robinson Aff. ¶ 3(c) (A43); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Morris, Palmer, Rice, Rose, Simmons, Smith, Taylor, Weaver and Wells Affs. ¶ 3(d) (A1-16, 22-40, 45-65).

18. In addition to selling coal directly to foreign customers, all Plaintiffs except Pacific Coast Coal Company make some export sales pursuant to contracts between Plaintiffs and third-party brokers who, in turn, have contracted with foreign customers. Hartzler Aff. ¶ 3(f) (A20); Simmons and Weaver Affs. ¶ 3(a) (A49 and 60); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶ 6 (A1-16, 22-29, 33-48, 52-59, 63-65).

19. Coal sold by Plaintiffs through brokers is prepared by Plaintiffs according to the foreign customers' specifications, as set forth in the contract between Plaintiffs and the brokers, as well as in the brokers' contracts with the foreign customers. Hartzler Aff. ¶¶ 3(e)-(f) (A19-20); Simmons and Weaver Affs. ¶ 3(a) (A49 and 60); Argon, Bethel, Bradshaw, Dickey, Leefers,

McConnell, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶ 6 (A1-16, 22-29, 33-48, 52-59, 63-65).

20. Plaintiffs know that coal sold to foreign customers through brokers is bound for export and actually exported because Plaintiffs, together with the railroad company, arrange for the coal to be shipped to the same export terminals that are used for their direct foreign sales. Hartzler Aff. ¶¶ 3(e)-(f) (A19-20); Simmons Aff. ¶ 3(a) (A50); Weaver Aff. ¶ 3(d) (A61); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶ 6 (A1-16, 22-29, 33-48, 52-59, 63-65).

21. There is virtually no possibility that coal sold for export by Plaintiffs through brokers can be diverted for domestic sale. Hartzler Aff. ¶¶ 3(e)-(f) (A19-20); Simmons Aff. ¶ 3(a) (A50); Weaver Aff. ¶ 3(c) (A61); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Palmer, Rice, Robinson, Rose, Smith, Taylor and Wells Affs. ¶ 6. (A1-16, 22-29, 33-48, 52-59, 63-65).

22. The terms of sale in Plaintiffs' export sales contracts vary by foreign customer or broker and are either FOB mine or FOB railcar (in which case title transfers when the coal is loaded onto the railcar at the mine for transport to the export terminal), FOB terminal (in which case title transfers when the coal arrives at the export terminal), FOB vessel (in which case title transfers as the coal passes over the railing of the vessel), or FOB foreign customer's plant (in which case title transfers when coal arrives at the purchaser's plant). Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Smith, Taylor, Weaver and Wells Affs. ¶ 5 (A1-48, 52-65).

23. Title never transfers in Plaintiffs' export sales of coal before the processed coal is loaded onto the railcars or trucks at the mine or loadout facility for transport to the export terminal (or

foreign customer). Argon, Bethel, Bradshaw, Dickey, Hartzler, Leefers, McConnell, Morris, Palmer, Rice, Robinson, Rose, Smith, Taylor, Weaver and Wells Affs. ¶ 5 (A1-48, 52-65).

24. Plaintiffs' sales of exported coal take place when the coal is in the process of being exported to a foreign customer. Hartzler, Morris, Simmons, Weaver and Wells Affs. ¶ 4 (A21, 32, 51, 61 and 64); Argon, Bethel, Bradshaw, Dickey, Leefers, McConnell, Palmer, Rice, Robinson, Rose, Smith and Taylor Affs. ¶¶ 4 and 6 (A1-16, 22-29, 33-48, 52-59, 63-65).

Respectfully submitted,

[signature]

Steven H. Becker
*Attorney of Record*
Paul A. Horowitz
Charles H. Critchlow
Suzanne I. Offerman
*Of Counsel*
COUDERT BROTHERS LLP
1114 Avenue of the Americas
New York, NY 10036
Tel.: (212) 626-4400
Fax: (212) 626-4120

Dated: May 20, 2004

Counsel for Plaintiffs
Consolidation Coal Company, et al.

[signature]

John Y. Merrell, Jr.
*Attorney of Record*
MERRELL & MERRELL, P.C.
1477 Chain Bridge Road
Suite 101
P.O. Box 1111
McLean, VA 22101
Tel.: (703) 790-8440
Fax: (703) 790-8944

Dated: May 19, 2004

Counsel for Plaintiff
Rapoca Energy Company, LLC,
f/ka/ Rapoca Energy Company

**CERTIFICATE OF SERVICE**

I, Suzanne I. Offerman, certify that I am an attorney with Coudert Brothers LLP, 1114 Avenue of the Americas, New York, New York, and that on May 21, 2004, I caused to be sent by Federal Express, Plaintiffs' Proposed Findings of Uncontroverted Fact, on the following attorneys:

Luke P. Levasseur, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530

Counsel for Defendant
United States

John Y. Merrell, Jr., Esq.
Merrell & Merrell, P.C.
1477 Chain Bridge Road
Suite 101
McLean, VA 22101

Counsel for Plaintiff
Rapoca Energy Company LLC
f/k/a Rapoca Energy Company

Suzanne I. Offerman

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATION COAL CO., *et al.*, Plaintiffs, v. UNITED STATES, Defendant. | ) | No. 01-254 (Judge Futey) |
| RAPOCA ENERGY CO., Plaintiff, v. UNITED STATES, Defendant. | ) | No. 01-442 (Judge Futey) |

**DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' RENEWED PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(d)(2), defendant, the United States, respectfully submits the following responses to each paragraph contained in the proposed finding of uncontroverted fact ("PFUF") submitted by plaintiffs Consolidation Coal Co. and Rapoca Energy Co., which was filed on May 21, 2004.

**GENERAL OBJECTION**

To the extent that any of the paragraphs in plaintiffs' PFUF assert that they pay the AML reclamation fee based upon the sale of coal, we disagree with and object to that characterization of the application of the fee. As we explain in our accompanying brief, the reclamation fee is paid upon coal produced, not the amount of coal sold.

**RESPONSES**

PFUF No. 1:

Defendant does not dispute this proposed finding.

PFUF No. 2:

Defendant does not dispute this proposed finding.

PFUF No. 3:

Defendant does not dispute this proposed finding.

PFUF No. 4:

Defendant disputes this proposed finding to the extent it indicates that plaintiffs pay the reclamation fee on coal that is sold, because that assertion is based upon plaintiffs' erroneous interpretations of 30 U.S.C. § 1232 and 30 C.F.R. § 870.12. The interpretations of 30 U.S.C. § 1232 and 30 C.F.R. § 870.12 are legal conclusions. As we explain in our accompanying brief, the reclamation fee is paid upon coal produced and not upon coal sold.

PFUF No. 5:

Defendant does not dispute this proposed finding.

PFUF No. 6:

Defendant does not dispute this proposed finding.

PFUF No. 7:

Defendant does not dispute this proposed finding.

PFUF No. 8:

Defendant does not dispute this proposed finding.

PFUF No. 9:

Defendant does not dispute this proposed finding.

PFUF No. 10:

Defendant does not dispute this proposed finding.

PFUF No. 11:

Defendant does not dispute this proposed finding.

PFUF No. 12:

Defendant does not dispute this proposed finding.

PFUF No. 13:

Defendant does not dispute this proposed finding.

PFUF No. 14:

Defendant does not dispute this proposed finding.

PFUF No. 15:

Defendant does not dispute this proposed finding.

PFUF No. 16:

Defendant does not dispute this proposed finding.

PFUF No. 17:

Defendant does not dispute this proposed finding.

PFUF No. 18:

Defendant does not dispute this proposed finding.

PFUF No. 19:

Defendant does not dispute this proposed finding.

PFUF No. 20:

Defendant does not dispute this proposed finding.

PFUF No. 21:

Defendant does not dispute this proposed finding.

PFUF No. 22:

Defendant does not dispute this proposed finding.

PFUF No. 23:

Defendant does not dispute this proposed finding.

PFUF No. 24:

Defendant does not dispute this proposed finding.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

LUKE LEVASSEUR
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, D.C. 20530
Telephone: (202) 616-0464
Telecopier: (202) 305-7643

July 9, 2004

Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 9th day of July 2004, I caused to be delivered by U.S. mail (first-class, postage pre-paid) a copy of this DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' RENEWED PROPOSED FINDINGS OF UNCONTROVERTED FACT addressed as follows:

Steven H. Becker
Paul A. Horowitz
Coudert Brothers LLP
1114 Avenue of the Americas
New York, New York 10036

John Y. Merrill, Jr.
Merrill & Merrill, P.C.
1477 Chain Bridge Road, Suite 101
McLean, Virginia 22101

**CERTIFICATE OF ELECTRONIC FILING**

I, Suzanne I. Offerman, certify that I am an attorney with Baker & McKenzie LLP, located at 1114 Avenue of the Americas, New York, New York, and that on September 3, 2008, a copy of the foregoing "Plaintiffs' Brief in Support of Post-Remand Motion for Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

Suzanne I. Offerman

Suzanne I. Offerman